## STATE v. HENRY DRESCHER.[1]

December 29, 1944.

No. 33,849.

*Meighen, Knudson & Sturtz,* for appellant.
*Harold C. Lindgren,* County Attorney, for the State.

LORING, CHIEF JUSTICE.

This is an action to determine whether defendant is the father of an illegitimate child born to Maletta Katzung on March 31, 1943.

[1]Reported in 17 N. W. (2d) 160.

Maletta is a sister of defendant's wife. She was 36 years old at the time of trial and is somewhat crippled from an attack of infantile paralysis in infancy. She usually resided on her father's farm a short distance from the defendant's farm, and after his death she lived there with her mother and two spinster sisters. In spite of her physical handicap, she is able to do considerable housework, and the defendant's wife has, from time to time, asked her to come to defendant's house and assist her with work. She has been doing so for years, and Maletta testified that on several of these occasions defendant had had intercourse with her. She claims that the intercourse which she asserts was the cause of her pregnancy occurred June 28, 1942. She had, on this occasion, been working for her sister for three or four weeks. The 28th of June was Sunday, and in 1942 it was the 25th anniversary of the defendant's marriage. That morning, defendant and his wife attended services at a neighboring Lutheran church. After the services, from 60 to 100 neighbors, relatives, and friends came to defendant's house to celebrate the anniversary. They brought with them much food and a couple of "ponies" of beer. Toward evening they all went home to attend to the chores on their various farms, but about eight o'clock the Emil Radkes, the Warner Radkes, together with some of their children, and a Mr. Nelson came to defendant's house to continue their visit. All of the beer had been consumed in the afternoon, but a quantity of ice cream and cake was left. All of those present at the house that evening except Maletta and the smaller children, who were not called upon to testify, swore that at about 12 p. m., when the company made ready to go home, defendant's wife invited them to partake of the ice cream and cake, which they all did. Then, at about 12:30 o'clock, one of the guests looked at his watch and announced that it was time to go home. The gathering broke up shortly afterward, and defendant and his wife went out to the two cars in which the company left, for the purpose of bidding the guests good night. Defendant and his wife immediately returned to the house, and they testified that the chil-

dren and Maletta had gone upstairs to bed when they came in from the cars.

On the other hand, Maletta testified there was no ice cream or cake served that evening; that the guests went home about 11:30 and that her sister, the defendant's wife, either was out or went out to look after her chickens in a brooder house located by Maletta at from twice the length of the courtroom to half a mile from the house. At various times in her testimony, she had estimated the time which her sister had been out to the chicken house to be from 15 minutes to two hours. She testified that after the guests had left and the children had gone upstairs to bed she was in the kitchen reading a book, whose title she could not remember, because, she said, "I didn't look at the [title] page." She said that defendant came into the kitchen after speeding the parting guests and took her into the bedroom on the ground floor, usually occupied by himself and his wife; that he there undressed but she did not; that they had sexual intercourse, after which she went upstairs to bed. She also testified that on occasions for three or four years, when she had been working for her sister, defendant had had intercourse with her, and that upon each occasion she had told her sister about it, and that on the morning of June 29 she told her sister of her experience the night before and said there was "going to be trouble." She testified at the preliminary hearing that defendant had intercourse with her three or four times during the month previous to June 28. At the trial she denied this. All of Maletta's statements were denied by her sister and by defendant.

Apparently Maletta was quite obese, because none of her sisters or her mother was aware that she was pregnant until the morning the baby was born, March 31, 1943. She had never told defendant that she was pregnant or sent word to him to that effect. She did not tell either the nurse or the doctor who took care of her on the day the baby was born that it was defendant's child. She first made the assertion some days later after a conference with her people at their home, which very much upset her.

It appears that Maletta's mother and sisters entertained hard feelings toward the defendant on account of an episode in which her brother had been involved and which resulted in his being sent to the penitentiary. It was their claim that a son of the defendant was as much involved in the crime as Maletta's brother and that the defendant had succeeded in having the prosecution dropped as to his own boy but left the uncle to take a penitentiary sentence. The mother and sisters candidly admitted their hard feelings toward defendant.

On this state of the record, with all of defendant's witnesses telling consistent, reasonable, and apparently credible stories with reference to the celebration of the wedding anniversary and with Maletta's unreasonable and improbable account, contradictory as it was in many respects, the defendant should have a new trial. Certainly, it was unnatural that an occurrence of this kind should take place on the evening of the defendant's silver wedding anniversary. Maletta's testimony is in complete conflict with that of the guests who returned for the evening visit. They testify with circumstantial particularity, whereas her own testimony is conflicting to such an extent that she varies the time that she claims her sister was out looking after the chickens from 15 minutes to two hours. She varies the distance from the house to the chicken house from, perhaps, 150 feet to half a mile. That she should suspect on the following morning after the alleged intercourse that she was pregnant, that there was "going to be trouble" strains credulity. Counsel asked her, "What sort of trouble?" to which she replied, "This little one." Then, too, it is extremely unlikely that her sister would continue to invite her to the house if, as Maletta claims, she had intercourse from time to time with the defendant and on each occasion had told her sister of it.

As for the matter of the chicken house, there is nothing in the record indicating that there was any occasion for defendant's wife to go out to it at the time of night at which Maletta claims she went. Certainly, she would not be likely to leave her guests unless there was some emergency. There was, to be sure, a stove in the

brooder house, but the testimony is that it was not running at that time. Maletta does not claim that it was. She stated that she supposed her sister was out at the chicken house "sitting down, * * * watching them." Of course, to give her story any semblance of probability, she had to say that her sister was out of the house, because her claim was that the intercourse took place on her sister's bed in the bedroom on the ground floor. Even if her sister was out at the chicken house, is it at all probable that the defendant on the occasion of his silver anniversary, or at any other time, would risk his wife's coming into their bedroom and finding him there with Maletta? There were openings in the ceilings of the downstairs rooms to permit heat to go into the upper story. The record indicates that these openings were not closed at the time under consideration, and that not only light but sounds came up from these openings so, as one of the boys who slept upstairs said, "You could hear everything that was going on down below, too."

There was testimony in the record to the effect that on a previous occasion, when Maletta had been left alone at the house to look after the defendant's children, one of the neighbors had been seen surreptitiously leaving the house in his stocking feet and that Maletta seemed embarrassed. However, there was no burden upon the defendant to show who was the father of the child. The burden lay upon the state to establish defendant's paternity by a fair preponderance of evidence. State v. McCullough, 102 Minn. 419, 113 N. W. 1059. As in that case, there was evidence here of the defendant's good moral character.

Under all the circumstances under which the intercourse is alleged to have taken place, it is very clear that a verdict resting alone upon the uncorroborated statements of the girl should not be permitted to stand, in view of the unconvincing character of her testimony.

Her improbable, contradictory, and inconsistent testimony is so manifestly and palpably contrary to the great weight of the evidence that we must conclude that not only has the state failed to establish the paternity of Maletta's child against the defendant by

a preponderance of evidence, but that the record demonstrates that the trial court should, in the exercise of its discretion in the furtherance of substantial justice, have granted a new trial. State v. McCullough, *supra*.

Order reversed and new trial granted.

STREISSGUTH, JUSTICE (dissenting).

At the age of three years the prosecutrix suffered an attack of infantile paralysis so severe that she has never been able to walk without the aid of crutches. In 1942, she was 36 years of age, very obese, and mentally subnormal. That any man, single or married, unrelated or related by affinity, should sexually covet a woman in her physical and mental condition seems unnatural and abhorrent. That some man did sexually embrace her about June 28, 1942, cannot be disputed in view of the birth of a child to her on March 31, 1943. That conviction of the defendant rests entirely upon her testimony is neither fatal nor even unusual in cases of this type, as any prosecuting attorney or welfare worker will substantiate.

Granted that the testimony of the prosecutrix as to the events of the night of June 28 was contradictory and inconsistent in many respects, she steadfastly adhered to her story that defendant had sexually known her on numerous occasions over a period of years, including the night of June 28, and that defendant was the only man who had so used her.

Defendant was unable, as in State v. McCullough, 102 Minn. 419, 113 N. W. 1059, to produce any substantial evidence tending to fix paternity of the child upon some other man.

In bastardy proceedings, proof of defendant's guilt need not be established beyond a reasonable doubt as in cases of carnal knowledge, rape, and other criminal offenses. And, whether viewed objectively or subjectively, I feel that the evidence is ample to sustain the verdict of guilty, a preponderance being sufficient. Though some doubt was necessarily cast upon the truth of the girl's complete story because of the inconsistencies therein, the jury nevertheless had a clear right to resolve the issue of fact in her favor. And,

in view of the fact that no complaint is made of any of the rulings on evidence or of any instructions to the jury or of any other aspects of the trial, I strongly feel that the verdict of guilty, approved as it was by an experienced trial judge, should be left undisturbed.

JULIUS J. OLSON, JUSTICE (dissenting).
I concur in the dissent of Mr. Justice Streissguth.